## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| Thaddius Intravaia and Steven Marvik, individually and as representatives of a class of similarly situated persons, and on behalf of the 401(k) Pension Plan,<br><br>Plaintiffs,<br><br>v.<br><br>National Rural Electric Cooperative Association and the Insurance and Financial Services Committee,<br><br>Defendants. | Case No.<br><br><br><br>**CLASS ACTION COMPLAINT** |

## <u>NATURE OF THE ACTION</u>

1.      Plaintiffs Thaddius Intravaia and Steven Marvik ("Plaintiffs"), as representatives of the Class described herein, and on behalf of the 401(k) Pension Plan (the "Plan"), bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"), against Defendants National Rural Electric Cooperative Association (NRECA) and the Insurance and Financial Services Committee (the "Committee"), the Plan's fiduciaries. As described herein, Defendants have breached their fiduciary duties and engaged in prohibited transactions with respect to the Plan in violation of ERISA, to the detriment of the Plan and its participants. Plaintiffs bring this action to remedy this unlawful conduct, prevent further mismanagement of the Plan, and obtain equitable and other relief as provided by ERISA.

## PRELIMINARY STATEMENT

2.      NRECA is a national service organization that represents over 1,000 rural electric cooperatives around the United States. One of NRECA's primary functions is to administer three ERISA plans covering member cooperatives' employees—a health and welfare plan, a traditional pension plan, and the Plan, the latter of which is the subject of this suit.

3.      ERISA imposes strict fiduciary duties of loyalty and prudence upon retirement plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Tatum v. RJR Pension Investment Committee*, 761 F.3d 346, 358 (4th Cir. 2014). Fiduciaries must act "solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1), and exercise "care, skill, prudence, and diligence" in carrying out their fiduciary functions.

4.      Defendants have not managed the Plan in a prudent and loyal manner. Instead, Defendants (1) failed to prudently monitor and control Plan administrative costs in the interests of Plan participants; (2) appropriated the extra fees from the Plan for their own benefit; and (3) diverted monies from the Plan to subsidize other expenses of NRECA and its member employers.

5.      The Plan is a defined contribution retirement plan, which means that participants' benefits are limited to their account contributions and investment returns, less expenses. *See Tibble v. Edison*, 135 S.Ct. 1823, 1825 (2015). According to the Department of Labor, plan expenses have a "substantial[]" impact on participants' retirement income. *See* DEP'T OF LABOR,

*A Look at 401(k) Plan Fees*, 1–2 (Aug. 2013) ("[F]ees and expenses paid by your plan may substantially reduce the growth in your account which will reduce your retirement income.").[1]

6.      The Plan's administrative costs are grossly excessive. The Plan is one of the 75 largest defined contribution plans in the United States (out of more than 650,000). As a result, Defendants have access to the most competitive pricing and services in the marketplace. While fiduciaries of similarly-sized plans typically incur administrative expenses well under $100 per participant, the Plan's administrative costs are wildly out of scale at more than $400 per participant.

7.      The problem is also getting worse with time. The Plan's administrative costs have increased each year since 2013, and the 2017[2] rate of $404 per participant is a 50% surge from the 2013 rate. Based on trends in the overall marketplace, the Plan's administrative costs should have decreased on a per-participant basis during this time. Further, the growth within the Plan provided significant opportunities for Defendants to reduce the Plan's administrative expenses. Yet, Defendants failed to take measures to reduce the Plan's expenses consistent with other retirement plan fiduciaries and marketplace trends, failed to leverage the Plan's size, and failed to advance the interest of participants, causing the Plan to pay unreasonable administrative fees.

8.      It is no wonder that Defendants have failed to prudently control the Plan's expenses: the primary beneficiary of the Plan's exorbitant administrative costs is NRECA. Defendants have extracted an increasing amount of revenue for NRECA from the Plan each year since 2013. NRECA took in $14.2 million from the Plan in 2013, $15.8 million in 2014, $17.0 million in 2015, $19.0 million in 2016, and $20.9 million in 2017. Defendants' incentive to

---

[1]      *Available      at*      www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited July 25, 2019) (hereinafter "DOL Fees").

[2] The most recent expense reports filed by the Plan contain data through the end of 2017.

increase revenue for NRECA is at odds with their duty to administer the Plan in a loyal and cost-conscious manner. The rising fees paid to NRECA in recent years shows that Defendants have been corrupted by their conflict.

9.      Defendants also improperly used the Plan to subsidize costs of NRECA's overall benefits program. As a defined contribution plan, the Plan is distinct from NRECA's traditional pension and health and welfare plans, in which participants are promised certain benefits, and NRECA's member employers are financially obliged to underwrite those benefits. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 440 (1999) (a sponsor must "make up any shortfall" in traditional defined benefit retirement plans); *Varity Corp. v. Howe*, 516 U.S. 489, 493 (1996) (sponsor liable for a scheme to avoid its "obligation to pay … employees their [welfare] benefits"). This funding distinction incentivizes Defendants to shift more shared costs to the Plan, thereby minimizing the financial liabilities incurred by NRECA's member employers related to the administration of the traditional pension and health and welfare plans.

10.     That is precisely what Defendants have done since 2013. During this time, the revenue NRECA extracted from the Plan increased by at least 32%, whereas NRECA's in-house charges to other plans decreased or remained around the same. As a result, around half of the fees that NRECA withdrew from its benefits program in 2017 came from the Plan, up from only 36% in 2013. Likewise, Defendants have increasingly allocated outside vendor charges to the Plan. The Plan paid $4.3 million to outside vendors that also served other NRECA benefit plans in 2017, up from $1.8 million in 2013. Plan participants have the right to a fiduciary focused solely on their interests and defraying costs debited against their retirement savings. Defendants have not met their basic obligations in this regard.

11.     As a result of Defendants' mismanagement of the Plan and failure to control Plan costs, the Plan has suffered millions of dollars in losses through excessive and inappropriate fees. Based on this conduct, Plaintiffs assert ERISA claims against Defendants for breach of their fiduciary duties (Count I), prohibited transactions with a party in interest (Count II), prohibited transactions with a fiduciary (Count III), failure to monitor fiduciaries (Count IV), and co-fiduciary liability under ERISA (Count V).

## JURISDICTION AND VENUE

12.     Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide, among other things, that participants in a an employer-sponsored retirement plan may pursue a civil action to redress violations of ERISA, recover losses resulting from a fiduciary breach, restore profits made by fiduciary self-dealing, and obtain appropriate equitable relief, as set forth in 29 U.S.C. §§ 1109 and 1132.

13.     This case present federal questions under ERISA, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

14.     Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because the Plan is administered in this district.

## THE PARTIES

### PLAINTIFFS

15.     Plaintiff Thaddius Intravaia resides in Greenville, Illinois, is a current participant in the Plan, and has been a Plan participant since 2016. Plaintiff Intravaia was charged a pro rata share of Plan fees through his Plan account. Plaintiff Intravaia's Plan account would be worth more today had Defendants not breached their fiduciary duties as described herein.

16.     Plaintiff Steven Marvik resides in Gig Harbor, Washington, is a current participant in the Plan, as has been a Plan participant since 1979. Plaintiff Marvik has been charged a pro rata share of Plan fees through his Plan account. Plaintiff Marvik's Plan account would be worth more today had Defendants not breached their fiduciary duties as described herein by imposing excessive charges on Marvik's and other participants' accounts.

## THE PLAN

17.     The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34). The Plan is also a "plan maintained by more than one employer" within the meaning of 26 U.S.C. § 413(c), commonly referred to as a "multiple employer plan" or "MEP".

18.     The Plan covers eligible employees of participating member cooperatives of NRECA. Participants contribute to their accounts through salary deferrals, and also may receive contributions from their employer.

19.     As of the end of 2017, the Plan had $10.4 billion in assets, 66,587 participants with account balances, and 886 participating cooperatives. The Plan is one of the largest defined contribution plans in the United States. As of the end of 2017, the Plan ranked 49th in assets and 73rd in participants with balances (out of more than 650,000 defined contribution plans).

## DEFENDANTS

### NRECA

20.     NRECA is a national cooperative service organization based in Arlington, Virginia that represents more than 1,000 member electric cooperatives throughout the United States. In addition to its employee benefits program, NRECA provides lobbying services, regulatory guidance, and employee training to member employers and their employees.

21.     The business and affairs of NRECA are managed under the direction of its board of directors, who has authority over NRECA's employees (including appointment of its CEO), its budget, and its duties. Every member of the board of directors and its individual officers are elected by member cooperatives. All amendments to the bylaws must also be approved by the member cooperatives. Given this governance structure, NRECA acts not only to serve its own financial interests as a national cooperative, but also the financial interests of member cooperatives, upon whom NRECA and its employees depend for their compensation and continued employment.

22.     NRECA is the "plan sponsor" of the Plan within the meaning of 29 U.S.C. § 1002(16)(B). Through its Board of Directors, NRECA organized the Committee, appointed the Committee to be a named fiduciary of the Plan (see *infra*, ¶ 23), and appoints individual members of the Committee.  NRECA is responsible for ongoing oversight of the Committee and its members, and has authority to remove the Committee from its position with regard to the Plan, or to remove individual Committee members from the Committee. Based on these duties, NRECA "exercises … discretionary authority or discretionary control respecting the management" of the Plan, and "has any discretionary authority or discretionary responsibility in the administration" of the Plan, and therefore acts as a fiduciary of the Plan under 29 U.S.C. § 1002(21)(A).

**The Committee**

23.     The Committee is a named fiduciary of the Plan, as contemplated by 29 U.S.C. § 1102(a). The Committee has between five and ten individual members, including senior NRECA officers. All of the Committee's members are appointed by NRECA's board of directors. The Committee exercises overall fiduciary responsibility for selecting and monitoring the Plan'

service providers and administering the Plan. The Committee also appoints NRECA employees to carry out specific administrative functions and monitors and oversees their work. Pursuant to these duties, the Committee "exercises … discretionary authority or discretionary control respecting the management" of the Plan, and "has any discretionary authority or discretionary responsibility in the administration" of the Plan, and therefore also acts as a functional fiduciary of the Plan under 29 U.S.C. § 1002(21)(A).

## **BACKGROUND**

### FIDUCIARY DUTIES AND COST CONTROL IN DEFINED CONTRIBUTION PLANS

24.     As of September 2018, Americans had approximately $8.1 trillion in assets invested in defined contribution plans, such as 401(k) and 403(b) plans.[3] Defined contribution plans are the primary retirement savings vehicle for many Americans, replacing defined benefit plans predominant in previous generations.[4]

25.     The potential for mismanagement and abuse is greater in defined contribution plans than in defined benefit plans. In a defined benefit plan, each participant is entitled to a fixed monthly payment, while the employer is responsible for making sure the plan is sufficiently capitalized, and thus the employer bears all risks related to excessive fees. *See Hughes Aircraft Co.*, 525 U.S. at 439. As a result, the employer and the plan's fiduciaries have every incentive to keep costs low. But in a defined contribution plan, participants' benefits "are limited to the value of their own investment accounts, which is determined by the market

---

[3] *See* INVESTMENT COMPANY INSTITUTE, *Defined Contribution Plan Participants' Activities, First Three Quarters of 2018* (2019), *available at* https://www.ici.org/pdf/ppr_18_rec_survey_q3.pdf (last visited July 25, 2019).
[4] *See* DEPT. OF LABOR, *Private Pension Plans Bulletin*, at 1 (Dec. 2018) ("The shift from defined benefit (DB) to defined contribution (DC) plans has been ongoing over the past 40 years[.]"), *available at* https://www.dol.gov/sites/default/files/ebsa/researchers/statistics/retirement-bulletins/private-pension-plan-bulletins-abstract-2016.pdf   (hereinafter "Plans Bulletin") (last visited July 25, 2019).

performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826.

Sponsors therefore do not have a direct incentive to keep costs low, as the consequences of high

fees are borne by participants.

26.     The potential for abuse is particularly pronounced in MEPs.  According to the

U.S. Government Accountability Office's report on multiple employer plans:

> the potential for inadequate employer oversight of the MEP is greater because employers
> have passed along so much responsibility to the entity controlling the MEP. Labor
> officials noted that potential abuses might include layering of fees, misuse of the assets,
> or falsification of benefit statements.[] One pension expert agreed that there was potential
> for MEPs to charge excess fees without the enrolled employer being aware of those
> fees.[] While Labor officials acknowledged that single employer plans could be subject to
> similar abuses, they cautioned that MEPs' structure and operation could make them
> particularly susceptible to such abuses.

GAO Report, at 22-23.

27.     The duties of prudence and loyalty imposed by ERISA are critical protections for

defined contribution plan participants and MEP participants. Pursuant to ERISA, plan fiduciaries

obligated to act "solely in the interest of the participants … and[] for the exclusive purpose of[]

providing benefits to participants … and defraying the reasonable expenses of administering the

plan." 29 U.S.C. § 1104(a)(1)(A). Fiduciaries also must act "with the care, skill, prudence, and

diligence" appropriate under the circumstances. 29 U.S.C. § 1104(a)(1)(B). These duties are

commonly described as "the duties of loyalty and prudence imposed by ERISA," *See Fifth Third*

*Bancorp. v. Dudenhoeffer*, 573 U.S. 409, 413 (2014), and are among "the highest known to the

law." *Tatum*, 761 F.3d at, 358.

28.     Cost control is inherent in these fiduciary responsibilities. *See* Restatement

(Third) of Trusts § 88, cmt. a (2007) ("Implicit in a trustee's fiduciary duties is a duty to be cost-

conscious."). This includes a duty to monitor both the type of charges being incurred and their

amount. *See id.*, cmt.b (after finding it proper to incur "a particular type of expense", a trustee

must further "exercise such care and skill as a person of ordinary prudence" in fixing the expense).

29.     Improper and excessive fees can significantly impair the value of a defined contribution plan participant's account. Over time, seemingly small differences in fees can result in material differences in the amount of savings available at retirement.[5] Industry observers have recognized that a "fee of only a few basis points[[6]] could end up being excessive."[7]

30.     For this reason, numerous courts have emphasized the importance of fiduciary cost control in defined contribution plans. *See Tibble v. Edison Intl.*, 843 F.3d 1187, 1198 (9th Cir. 2016) ("[A] trustee cannot ignore the power the trust wields to obtain … lower cost[s][.]") (remanding for further consideration of alleged breach); *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) (failure to "adequately leverage the Plan's size to reduce fees" supported judgment against fiduciaries); *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011) ("[A] trier of fact could reasonably conclude that defendants did not satisfy their duty to ensure that [vendor]'s fees were reasonable.") (remanding for trial); *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595-96 (8th Cir. 2009) (fiduciary's decision that resulted in "significantly higher fees" was plausibly "tainted by failure of effort, competence, and loyalty") (reversing dismissal of complaint).

---

[5] *See* DEPT. OF LABOR, *A Look at 401(k) Plan Fees*, 1–2 (Aug. 2013) ("[F]ees and expenses paid by your plan may substantially reduce the growth in your account which will reduce your retirement income.") (illustrating how fees of 1% will reduce retirement savings by 28% over time), *available at* https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited July 25, 2019) (hereinafter "DOL Fees").

[6] One basis point is equal to .01%, or 1/100th of a percent of assets under management. *See* Investopedia, Definition of 'Basis Point (BPS)', http://www.investopedia.com/terms/b/basispoint.asp (last visited July 25, 2019).

[7] *See* SOCIETY FOR HUMAN RESOURCE MANAGEMENT, *401(k) Sponsors Focus on Benchmarking—and Lowering—Fees*, (Feb. 22, 2018), *available at* https://www.shrm.org/resourcesandtools/hr-topics/benefits/pages/401k-fee-benchmarking.aspx (hereinafter "SHRM Focus on Fees") (last visited July 25, 2019).

31.     According to an annual survey of large and "mega" plan sponsors,[8] reviewing plan fees was their "most important step" taken in each of the last three years.[9] Plan sponsors also anticipate that plan fees will continue to be their primary focus over the next year.[10]

32.     Consistent with this focus on fees, both overall fees and administrative fees have declined in defined contribution plans over time. Annual plan filings with the Department of Labor show that overall costs for defined contribution plans with more than $1 billion in assets decreased by 22% percent between 2009 and 2016.[11] Between 2016 and 2018, the C*allan Trends* survey documented similar findings. Each year, at least 77% of sponsors reviewed plan costs,[12] and each year, at least 36% reduced or rebated fees as a result of that review.[13] Another survey found that 83% of sponsors (of plans with average assets of $1.1 billion in assets) re-contracted

---

[8] The 401(k) marketplace is segmented by size. There is some fluidity in terms, but "large" plans typically have $100 million in assets or more, and "mega" plans have $500 million to $1 billion in assets or more. *See* CALLAN INSTITUTE, *Defined Contribution Trends* (2019), at 4, *available at* https://www.callan.com/wp-content/uploads/2019/01/Callan-2019-DC-Trends-Survey.pdf    (last visited July 25, 2019) (hereinafter "Callan Trends 2019"); *See* DELOITTE/INVESTMENT COMPANY INSTITUTE, *Inside the Structure of Defined Contribution/401(k) Plan Fees: A Study Assessing the Mechanics of the 'All-In' Fee* (Nov. 2011), at 10 & Ex. 4, *available at* https://www.ici.org/pdf/rpt_11_dc_401k_fee_study.pdf (last visited July 25, 2019) (hereinafter "Deloitte/ICI Study").

[9] *See Callan Trends*, at 2,4, 11

[10] *Id.*, at 12.

[11] *See* BRIGHTSCOPE/INVESTMENT COMPANY INSTITUTE, *The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans* (June 2019), at 47 & Ex. 4.1, *available at* https://www.ici.org/pdf/19_ppr_dcplan_profile_401k.pdf (last visited July 25, 2019) (hereinafter "BrightScope/ICI Close Look"). This 2016 filing year is the most recent year that has been comprehensively analyzed and reported consistent with methods used for the 2009 year.

[12] *See* Callan Trends 2019, at 41 (77.1% reviewed costs in the last year); CALLAN INSTITUTE, *Defined Contribution Trends* (2018), at 43 (83.1%), *available at* https://www.callan.com/wp-content/uploads/2018/01/Callan-2018-DC-Survey.pdf (last visited July 25, 2019) (hereinafter "Callan Trends 2018"); CALLAN INSTITUTE, *Defined Contribution Trends* (2017), at 43 (78.8%), *available at* https://www.callan.com/wp-content/uploads/2018/01/Callan-2017-DC-Survey.pdf (last visited July 25, 2019) (hereinafter "Callan Trends 2017");

[13] *See* Callan Trends 2019, at 43 (37.3% reduced or rebated fees in the last year); Callan Trends, 2018, at 45 (47.7%); Callan Trends 2017, at 45 (39.8%).

their plan's core administrative services between 2014 and 2017.[14] This corresponded to a 16% decrease in the median cost of those services.[15]

33.     As costs decrease, plans are also changing how they charge participants for administrative services. Administrative expenses (e.g., recordkeeping fees, trustee fees, professional fees, consulting fees, etc.) "can be levied based on the number of participants, the amount of assets, or as a fixed dollar amount for the plan as a whole."[16] An increasing majority of plans charge administrative expenses to participant accounts through an explicit per participant fee (e.g., $50 annually per participant), rather than a percentage of assets.[17]

34.     Although an asset-based charge or other arrangement can be permissible if properly evaluated and adjusted based on actual costs,[18] an explicit per participant charge for administrative services better corresponds to how administrative costs are accrued. Studies of defined contribution plan expenses have consistently observed that administrative costs are largely a function of the number of participants, and bear little or no relationship to asset values.[19] Many sponsors therefore prefer an explicit per participant charge,[20] which mitigates the

---

[14] *See* NEPC, *12th Annual Defined Contribution Plan and Fee Survey*, at 2, 10, *available at* https://www.youtube.com/watch?v=2BBTVYH_nfg&t=20s (00:25 *et seq.* & 15:25 *et seq.*) (hereinafter "NEPC Survey") (last visited July 25, 2019).

[15] *Id.*

[16] BrightScope/ICI Close Look, at 45.

[17] Callan Trends 2019, at 44 (63.8% charged explicit per participant fee in survey conducted fall 2018, compared to 54.7% in fall 2017).

[18] DOL Fees, at 3 ("Regardless of the arrangement used, fees need to be evaluated, keeping in mind the cost of all covered services.");

[19] *See* OFFICE OF POLICY RESEARCH, *Final Report: Study of 401(k) Plan Fees and Expenses* (Apr. 13, 1998), at § 4.2.2 (identifying "six major considerations" that determine "appropriate plan administration fees"; "number of plan participants" was a major factor, but total plan assets was not a factor), *available at* https://www.dol.gov/sites/dolgov/files/legacy-files/ebsa/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf (hereinafter "OPR Report") (last visited July 25, 2019); Deloitte/ICI Study, at 5 ("[N]umber of participants[] was found to be a significant driver of a plan's 'all-in' fee.").

[20] *See* SOCIETY FOR HUMAN RESOURCE MANAGEMENT, *401(k) Plan Enhancements and Falling Fees Linked to Richer Retirements* (Feb. 5, 2019) ("Plan sponsors continue to negotiate fees aggressively and prefer flat per-participants fees over asset-based fees.") (quoting research

peril of excessive fees (or insufficient fees) if asset values fluctuate out of step with factors, like the number of plan participants, that are more closely aligned with actual costs.[21]

35.     Another trend is that larger plans have lower rates of fees. There are several reasons why larger plans pay lower rates. First, there are a limited number such plans,[22] and competition between service providers for their business is fierce.[23] Second, certain costs are fixed costs, so "[a]s a plan grows in size, those fixed costs can be spread over more participants and a larger asset base," lowering the rate of fees.[24] Third, for variable costs, there are economies of scale that reduce the cost of each additional participant account or each additional dollar administered.[25] Industry consultants, observers, and experts therefore expect that a prudently managed plan's rate of fees will decrease as the size of the plan increases.[26]

---

officer at 401(k) services firm), *available at* https://www.shrm.org/resourcesandtools/hr-topics/benefits/pages/401k-enhancements-raise-savings-rates.aspx (hereinafter "SHRM Falling Fees") (last visited July 25, 2019); *See* DELOITTE, *Defined Contribution Benchmarking Survey* (2017), at 21 ("This shift further illustrates how plan sponsors are evaluating their fiduciary responsibility as they look at reasonable fees."), *available at* https://www2.deloitte.com/us/en/pages/human-capital/articles/annual-defined-contribution-benchmarking-survey.html (hereinafter "Deloitte Benchmarking Survey") (last visited July 25, 2019).

[21] *See, e.g., Tussey v. ABB, Inc.*, 2012 WL 1113291, at *11 (W.D. Mo. Mar. 31, 2012) (asset-based charged resulted in a 177% increase in fees per participant between 2002 and 2007, whereas the reasonable rate based on actual costs would have decreased by 37% during the same period), *aff'd in relevant part*, 746 F.3d 327 (8th Cir. 2014).

[22] *See* Plans Bulletin, at 11-12(at the largest end of the scale occupied by the Plan, only 164 plans have more than 50,000 participants with balances, and only 291 have more than $2.5 billion in assets, out of 656,241 total defined contribution plans).

[23] *See* OPR Report, at § 3.7 ("[C]ompetition makes the market for large corporation plans very efficient.")

[24] BrightScope/ICI Close Look, at 52.

[25] *See* OPR Report, at § 4.2.2 ("[T]here are significant economies of scale enjoyed by larger plans.").

[26] *See Kraft Foods*, 641 F.3d at 800 (consultant's evidence showed that service provider "should have offered a tiered pricing structure in which the per-participant cost went down as the number of participants went up."); SHRM Focus on Fees ("[C]osts … decreas[e] on a per-participant basis for larger plans."); *Karla Terraza v. Safeway Inc.*, Case No. 16-CV-03994-JST (N.D. Cal.), Expert Report of Roger L. Levy, ECF No. 158-2 (July 8, 2018), at 13 ("[F]or large plans … recordkeeping expenses (which benefit from economies of scale) are typically cheaper on a per participant basis.") (hereinafter "Levy Report").

36.     There are several measures that prudent and loyal fiduciaries take to control plan costs. First, fiduciaries should regularly calculate and benchmark plan fees.[27] Fiduciaries typically use consultants or other outside sources to provide data on fees paid by similar plans.[28] This data allows fiduciaries to assess the reasonableness of their own plan's fees.[29] Second, prudent fiduciaries conduct competitive bidding for administrative services at regular intervals, and additionally as the circumstances demand.[30] Industry experts believe that competitive bidding every 3-5 years as a matter of course is prudent, and also should be pursued "immediately" if a fiduciary has reason to believe the plan is paying more than reasonable fees.[31]

## **DEFENDANTS' VIOLATIONS OF ERISA**

37.     Defendants have violated ERISA in at least three ways.  Defendants (1) failed to prudently monitor and control Plan administrative costs in the interests of Plan participants; (2) used the extra fees from the Plan for their own benefit; and (3) unfairly allocated fees and costs to the Plan in a manner that subsidized other expenses of NRECA or its member employers.

### DEFENDANTS FAILED TO PRUDENTLY MONITOR AND CONTROL PLAN COSTS IN THE INTEREST OF PLAN PARTICIPANTS

38.     Defendants have not satisfied their duties of prudence and loyalty in regard to monitoring and controlling Plan costs.

---

[27] *See* Callan Trends 2019, at 42 ("Over four of five plan sponsors (83.3%) benchmarked the level of plan fees as part of their fee calculation process [within that past 12 months].").

[28] *See id.*

[29] *See id.*; Levy Report at 26  (fiduciaries should "avail themselves of one or more benchmarking services to evaluate how their plan costs compare to other plans") (hereinafter "Levy Report").

[30] *See* OPR Report, at § 3.5 ("An important strategy for minimizing costs is to obtain competitive bids from a number of 401(k) service providers.")

[31] *See* Levy Report, at 14 ("[T]he minimum standard of care requires fiduciaries to engage in this process every 3-4 years, depending on the facts and circumstances."); *id.*, at 23-24 (a fiduciary should "immediately launch[] an investigation" to "establish the reasonable cost" of services if the reasonable level of fees is in doubt); SHRM Falling Fees ("Plan sponsors should execute RFPs every five years because 'it's going to lower your fees, in all likelihood.'") (quoting research officer at 401(k) services firm).

39.     Since 2013, Defendants burdened the Plan with administrative expenses between $265 per participant per year and $404 per participant per year. These amounts are unreasonably high and inconsistent with the market for administrative services to defined contribution plans.

40.     For example, the District of Colorado recently found that Oracle Corp. properly reviewed cost benchmarking information from multiple sources before arriving at a reasonable rate for core administrative services for its plan in 2012. *See Troudt v. Oracle Corp.*, WL 1006019, at *7-*8 (D. Colo. Mar. 1, 2019). The rate was $30 per participant. *See id.* The Oracle plan and the Plan had around the same number of participants in 2012 (59,762 and 61,963, respectively) and at the end of 2017 (74,668 and 66,587, respectively). After adding reported miscellaneous administrative expenses, the Oracle plan appears to have paid no more than $40 per participant since 2012, around 6-10 times less than the Plan paid during the same period.

41.     Other case studies show that typical administrative expenses for the largest plans were far below what Defendants charged to the Plan. In a peer comparison of 19 large plans with a median participant head count of 38,631, an industry consultant calculated the median administrative cost in 2012 to be $56 per participant. *See Terraza v. Safeway, Inc.*, Case No. 16-cv-3994-JST, 2019 WL 1589979, at *2 (N.D. Cal. Apr. 12, 2019) (citing ECF 152-2). The Plan was larger still, with 61,963 participants in 2012, but Defendants charged the Plan at least 4 times more in administrative fees.

42.     The Plan's excessive administrative costs became even more egregious with time, as market costs declined, *see e.g., Troudt*, 2019 WL 1006019, at *7 ("[T]he per-participant costs also decreased significantly [between 2010 and 2017]."), while the Plan's costs rose over 50% during the class period, *see infra* at ¶¶ 45-46.

43.     Defendants deduct administrative fees from the Plan on a periodic basis (at least as frequently as quarterly) based on the value of Plan assets. When a fiduciary chooses to withdraw administrative fees as a percentage of Plan assets, it is the fiduciary's duty to monitor asset values and other relevant factors to ensure that an increase in Plan assets does not result in excessive administrative charges.   However, Defendants failed to discharge their duty in this regard.

44.     Since 2013, Defendants imprudently applied the same percentage rate to a rapidly increasing asset base to draw administrative fees.[32] The result was runaway administrative fees.

45.     As the following illustration shows, Plan asset growth has far outpaced growth to the number of individual participants and participating cooperatives served by the Plan:

*Illustration 1: Plan Assets, Participants, and Cooperatives*

|      | Plan Assets—Year End | Participants with Account Balances—Year End | Contributing Cooperatives |
| --- | --- | --- | --- |
| 2017 | $10,420,200,539 | 66,587 | 886 |
| 2016 | $8,824,851,510 | 64,755 | 904 |
| 2015 | $8,142,091,182 | 64,638 | 883 |
| 2014 | $8,091,121,413 | 62,967 | 894 |
| 2013 | $7,566,831,528 | 62,484 | ≤ 930 |
| 2012 | $6,198,597,012 | 61,963 | ≤ 930 |

---

[32] Defendants do not identify an administrative expense ratio separate from investment management expense ratios. Instead, a total expense ratio—the sum of administrative fees and investment managements fees—is applied to all participant assets. Based on external data regarding Plan investment managers' typical fees and the total Plan administrative expenses reported in the Plan's annual reports, it appears that the Plan administrative expense ratio has remained around 0.25% since 2013. In contrast, the median plan with more than $1 billion in assets paid around 0.05% to 0.07% during the same time. *See* BrightScope/ICI Close Look, at 47 & n.46 (reporting median total plan expenses of 0.36% to 0.28% between 2009 and 2016 for billion dollar plans, and citing a similar study that attributed only 18% of such costs to administrative fees, or 0.05% to 0.07% of total assets).

46. As reflected by the data, the Plan's assets increased by 68% between the start of 2013 and the end of 2017, while the Plan's participants increased by only 7% and the number of participating cooperatives remained about the same or slightly decreased.[33]

47. Because Defendants did not appropriately adjust the administrative expense ratio to account for these changes in the Plan, the Plan paid significantly more in fees each year on an absolute basis, per participant basis, and a per cooperative basis, as shown by the next illustration:

*Illustration 2: The Plan's Rising Administrative Costs, 2013-2017*

|  | Administrative Costs[34] | Per Participant[35] | Per Cooperative |
|---|---|---|---|
| 2017 | $26,541,793 | $404 | $29,957 |
| 2016 | $23,365,121 | $361 | $25,846 |
| 2015 | $20,044,330 | $314 | $22,700 |
| 2014 | $18,552,734 | $296 | $20,752 |
| 2013 | $16,472,514 | $265 | ≥ $18,024 |

48. The extra fees were not justified by extra service demands. While a small increase in Plan participants may have warranted a like increase in total expenses, the per participant rate should not have increased (and likely should have decreased consistent with market trends). Yet, the Plan's per participant rate increased by 50%. And although the number of participants is the

---

[33] Prior to 2014, multiple employer plans were not required identify all contributing employers in their annual Department of Labor reports. For 2012 and 2013, the Plan stated only an estimate of the total number.

[34] This column represents the "[t]otal administrative expenses" reported on Schedule H, Part II(i)(5) of the Plan's annual reports, minus the portion categorized as "investment advisory and management fees" (see Part II(i)(3)). An alternative method of calculating Plan administration costs—adding all direct, non-investment service provider payments reported on Schedule C of the Plan's annual reports—shows similar totals and a similar escalation in fees: 2013: $16,761,930; 2014: $20,621,536; 2015: $22,002,527; 2016: $25,732,184; 2017: $26,616,353.

[35] To estimate the per-participant cost of administering the Plan over the course of each year, this chart uses the average of the year-start and year-end participant totals (see *supra*, Illustration 1).

most important factor used to determine appropriate administrative fees, the number of cooperatives served by the Plan also did not justify the extra fees. Indeed, the number of distinct cooperatives remained about the same each year.

49.     Fiduciaries of other large defined contribution plans have been cutting fees by benchmarking fees, re-negotiating contracts, and placing services out for competitive bids. Defendants' failure to control costs or strategically outsource administrative servicing of the Plan demonstrate either that they failed to investigate cost-saving options with the care and diligence that a prudent fiduciary would have employed, or that they refused to consider any such options because it would have been contrary to their financial incentives. Meanwhile, costs for Plan participants soared as Defendants idly charged the same percentage rate to a changing Plan.  This was imprudent, disloyal, or both.

### DEFENDANTS USED THE EXTRA FEES FROM THE PLAN FOR THEIR OWN BENEFIT

50.     Defendants have benefitted from their own inaction. As extra fees were drawn from the Plan due to rising asset values and Defendants' failure to make a corresponding adjustment to the administrative expense ratio, Defendants received and retained the largest share of the surge in fees. As the next illustration shows, NRECA's own compensation has increased year after year in total and on a per-participant and per-cooperative basis:

*Illustration 3: NRECA's Rising Compensation from the Plan, 2013-2017*

|  | NRECA's Compensation | Per Participant | Per Cooperative |
|---|---|---|---|
| 2017 | $20,880,708 | $318 | $23,567 |
| 2016 | $18,990,578 | $294 | $21,007 |
| 2015 | $17,038,135 | $267 | $19,296 |
| 2014 | $15,182,085 | $252 | $17,787 |
| 2013 | $14,157,880 | $228 | $\geq$ $15,224 |

51.     Defendants did more than increase NRECA's own compensation from the Plan. As the next illustration shows, Defendants also increased the Plan's relative share of NRECA's total expenses compared to other benefits plans, placing a higher burden on Plan participants and relieving NRECA member employers of their burden to generate and maintain appropriate funding for the other plans' expenses. This was improper. Defendants were obligated to charge the Plan solely for the benefit the Plan and its participants, and were prohibited from using the Plan to defray other obligations.

**Illustration 4: The Plan's Rising Share of NRECA's Compensation**

| | NRECA's Total Compensation from All Plans | The Plan's Share | Traditional Pension's Share | H&W Plan's Share |
|---|---|---|---|---|
| 2017 | $42,872,708 | $20,880,708 (49%) | $13,309,000 (31%) | $8,593,000 (20%) |
| 2016 | $42,129,578 | $18,990,578 (45%) | $13,873,000 (33%) | $9,266,000 (22%) |
| 2015 | $43,274,135 | $17,038,135 (39%) | $14,334,000 (33%) | $11,902,000 (28%) |
| 2014 | $45,531,085 | $15,182,085 (35%) | $12,899,000 (28%) | $16,820,000 (37%) |
| 2013 | $39,162,880 | $14,157,880 (36%) | $13,253,000 (34%) | $11,752,000 (30%) |

52.     In contrast to the Plan, NRECA's traditional pension plan and health and welfare plan paid steady or declining amounts for NRECA's in-house services from 2013 to 2017. In effect, Defendants used the extra fees drawn from the Plan (which were borne by participants, i.e. current and former employees of the member employers) to reduce the expenses of the other benefit plans (which were the responsibility of NRECA's member employers themselves).

53.     Several additional facts raise further alarm. With regard to outside service provider fees, Defendants split the bills between plans. While this is not per se imprudent, split bills are problematic where the bill is not split properly. Defendants had the ability overstate the

relative contribution of a service provider to the Plan versus the traditional pension plan or health and welfare plan, thereby charging more to the Plan than was reasonable or prudent (while relieving NRECA member employers' potential funding liabilities to the other plans). The available data suggests this is precisely what happened. As shown by the illustration below, the Plan has contributed to a higher number of split vendor charges, and paid significantly more in total in connection with split bills, since 2013:

*Illustration 5: The Plan's Payment of Outside Administrative Services Provider Costs Split Between Plans*

|  | Number of Split Administrative Bills Joined by The Plan | Total Plan Payments on Split Administrative Bills |
|---|---|---|
| 2017 | 41 | $4,331,566 |
| 2016 | 40 | $5,563,656 |
| 2015 | 37 | $3,355,332 |
| 2014 | 32 | $3,167,925 |
| 2013 | 28 | $1,809,324 |

54.     NRECA's annual financial report for 2017 also suggests that Defendants used the Plan's escalating fees for the benefit of NRECA and its member employers. The report identifies a total surplus of $4.5 million within "cost reimbursable" programs, an accounting unit that consists primarily of NRECA's benefits plans. Although the financials do not attribute the $4.5 million surplus to a particular source or sources, it is reasonable to infer that the Plan's record-high fees contributed. Yet, the report states that NRECA directed the entire $4.5 million surplus to the traditional pension plan (for which NRECA's member employers was financially responsible). This re-allocation is another way that Defendants used the Plan's fee excesses for the financial benefit of NRECA's member employers, at the expense of their employees.

### PLAINTIFFS LACKED KNOWLEDGE OF DEFENDANTS' ERISA VIOLATIONS.

55.     Plaintiffs did not have knowledge of all material facts (including, but not limited to, pricing trends in defined contribution plans, the factors relevant in determining appropriate administrative fees in defined contribution plans, year-by-year changes in Plan administrative fees on a per participant or per cooperative basis, year-by-year changes in the share of NRECA's internal costs charged to the Plan versus other plans, NRECA's interest in shifting costs to the Plan, and the number and dollar amount of service provider charges split between the Plan and other plans), necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until recently, shortly before this action was filed. Further, Plaintiffs do not have actual knowledge of the specifics of the decision-making processes behind Defendants' management of the Plans' administrative functions and Defendants' overall management of the benefit plans because such information is exclusively in the possession of Defendants prior to discovery. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth above.

### CLASS ACTION ALLEGATIONS

56.     29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of a 401(k) Plan to bring an action individually on behalf of the Plan to obtain for the Plan the remedies provided by 29 U.S.C. § 1109(a). Plaintiffs seek certification of this action as a class action pursuant to this statutory provision and Fed. R. Civ. P. 23.

57.     Plaintiffs assert their claims in Counts I–V on behalf of a class of participants and beneficiaries of the Plan defined as follows:[36]

---

[36] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

> All participants and beneficiaries of the NRECA 401(k) Pension Plan at any time on or after July 25, 2013, excluding members of the Insurance and Financial Services Committee and any other NRECA employees with discretionary responsibility for the Plan's administrative functions or costs.

58.     <u>Numerosity</u>:   The Class is so numerous that joinder of all Class members is impracticable. The Plan had more than 60,000 participants with account balances during the applicable period.

59.     <u>Typicality</u>:     Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs are participants in the Plan and suffered injuries as a result of Defendants' mismanagement of the Plan and failure to properly monitor and control Plan costs. Defendants treated Plaintiffs consistently with other Class members with regard to the Plan. Defendants' imprudent and disloyal decisions affected all Class members similarly.

60.     <u>Adequacy</u>:     Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with the Class that they seek to represent, and have retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

61.     <u>Commonality</u>: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

     a.   Whether Defendants are fiduciaries of the Plan;

     b.   The scope of each Defendant's fiduciary duties;

     c.   Whether Defendants breached their fiduciary duties by engaging in the conduct described herein;

    d.   Whether Defendants engaged in prohibited transactions by engaging in the conduct described herein;

    e.   Whether NRECA breached its duty to monitor the Committee;

    f.   Whether Defendants are subject to co-fiduciary liability under ERISA;

    g.   The proper form of equitable and injunctive relief; and

    h.   The proper measure of monetary relief.

62.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

63.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court, such as removal or replacement of a fiduciary of the Plan, would be dispositive of non-party participants' interests. The accounting and restoration of the property of the Plan that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of Class members.

64.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest

23

in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

## COUNT I
### Breach of Duties of Loyalty and Prudence
### 29  U.S.C. § 1104(a)(1)(A)-(B)

65.     As alleged through this Complaint, Defendants are fiduciaries of the Plan.

66.     ERISA imposes strict fiduciary duties of prudence and loyalty upon Defendants in their administration of Plan, and required them to closely monitor and control Plan expenses to ensure that such expenses were reasonable and appropriate. *See* 29 U.S.C. § 1104.

67.     Defendants have breached these duties, and continue to breach these duties, by engaging in the conduct described herein.

68.     Defendants engaged in imprudent and disloyal conduct in violation of ERISA by failing to take appropriate steps to manage and control the Plan's administrative expenses in the interest of Plan participants, and by using charges to the Plan to benefit NRECA and its member employers. Among other things, Defendants caused the Plan to pay higher-than-market fees for administrative services, failed to restrain escalating fees, and used the extra fees for NRECA's benefit in various ways, including increasing NRECA's compensation, decreasing the amount

NRECA' member employers had to contribute to other benefits programs' costs, and causing the Plan to pay more than its fair share for outside vendors shared between other benefit plans.

69.     As a consequence of Defendants' breaches of fiduciary duty, the Plan has suffered millions of dollars in losses due to excessive, unreasonable, and inappropriate fees. Defendants are liable to make good to the Plan all losses suffered as a result of Defendants' fiduciary breaches, and to disgorge all profits resulting from Defendants' unlawful conduct. In addition, the Plan and Plan participants are entitled to further equitable and injunctive relief to redress Defendants' fiduciary breaches.

<u>**COUNT II**</u>
**Prohibited Transactions with a Party in Interest**
**29  U.S.C. § 1106(a)(1)**

70.     As alleged throughout this Complaint, NRECA is a fiduciary of the Plan, a service provider to the Plan, the plan sponsor, a plan employer, and an employee organization whose members are covered by the Plan. NRECA is therefore a party in interest with respect to the Plan under 29 U.S.C. § 1002(14)(A)-(D).

71.     As described throughout the Complaint, Defendants have caused the Plan to engage in transactions with NRECA for the benefit of NRECA. These transactions took place on a periodic basis (at least as frequently as quarterly) throughout the statutory period as Defendants withdrew and retained fees from the Plan.

72.     These transactions constituted a direct or indirect transfer of assets of the Plan to a party in interest, a transfer of assets of the Plan for use by a party in interest, and a transfer of the assets of the Plan for the benefit of a party in interest, in violation of 29 U.S.C. § 1106(a)(1)(D).

73.     In addition, these transactions also involved the furnishing of services between the Plan and a party in interest, in violation of 29 U.S.C. § 1106(a)(1)(D).

74.     These transactions were unlawful under ERISA, and the amounts paid to NRECA were excessive and unreasonable. As a direct and proximate result of these prohibited transactions, Plan participants directly or indirectly paid millions of dollars in improper fees to NRECA. Defendants are liable to make good to the Plan all losses suffered as a result of these prohibited transactions, and to disgorge all profits associated with their unlawful conduct. In addition, the Plan and Plan participants are entitled to further equitable and injunctive relief on account of these prohibited transactions.

## COUNT III
## Prohibited Transactions with a Fiduciary
## 29  U.S.C. § 1106(b)

75.     As alleged throughout this Complaint, NRECA is a fiduciary of the Plan.

76.     Acting in a fiduciary capacity, Defendants improperly directed assets of the Plan to NRECA for its own benefit. These transactions occurred on a periodic basis throughout the class period (at least as frequently as quarterly) as Defendants withdrew Plan assets and placed them in NRECA's own accounts.

77.     These transactions were prohibited under ERISA, and the amounts paid to NRECA were excessive and unreasonable.  NRECA dealt with the Plan's assets in its own interest and for its own accounts, in violation of 29 U.S.C. § 1106(b)(1), and received consideration for its personal accounts in connection with transactions involving assets of the Plan, in violation of 29 U.S.C. § 1106(b)(3).

78.     As a direct and proximate result of these prohibited transactions, the Plan directly or indirectly paid millions of dollars in improper fees to NRECA. Defendants are liable to make good to the Plan all losses suffered as a result of these prohibited transactions, and to disgorge all

profits associated with their unlawful conduct. In addition, the Plan and Plan participants are entitled to further equitable and injunctive relief on account of these prohibited transactions.

### COUNT IV
### Failure to Monitor Fiduciaries
### 29 U.S.C. § 1132(a)(3)

79.    As alleged throughout this Complaint, Defendants are fiduciaries of the Plan.

80.    In its fiduciary capacity, NRECA organized the Committee, delegated discretionary control of Plan administrative functions to the Committee, and appointed Committee members.

81.    NRECA had a duty to monitor the performance of its fiduciary appointees under ERISA, and to ensure that its appointed fiduciaries were performing their fiduciary obligations in compliance with ERISA. *See* 29 C.F.R. § 2509.75-8, FR-17.

82.    NRECA breached its fiduciary monitoring duties by, among other things:

   a) Failing to monitor and evaluate the performance of the Committee and its members, or have a system in place for doing so, standing idly by as the Plan suffered substantial losses as a result of the imprudent actions and omissions of the Committee;

   b) Failing to monitor the Committee's fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein;

   c) Failing to implement a system to avoid conflicts of interest that tainted the decisions made by the Committee; and

   d) Failing to remove fiduciaries whose performance was inadequate in that they failed to properly monitor and control Plan expenses, to the detriment of the Plan and participants' retirement savings.

27

83.     As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars in losses per year due to excessive, unreasonable, and inappropriate fees.

84.     Pursuant to 29 U.S.C. § 1109(a), 1132(a)(2), and 1132(a)(3), NRECA is liable to restore to the Plan all losses suffered as a result of NRECA's failure to properly monitor the Committee and its members, and must disgorge all profits resulting from its failure to monitor. In addition, the Plan and Plan participants are entitled to further equitable and injunctive relief.

**COUNT V**
**Co-Fiduciary Liability**
**29 U.S.C. § 1105(a)**

85.     As alleged throughout this Complaint, Defendants are co-fiduciaries of the Plan.

86.     Defendants worked closely together on matters relating to the Plan. Senior NRECA officials served on the Committee, and the Committee appointed NRECA employees to carry out administrative functions.

87.     During the relevant time, each Defendant knew of the actions and omissions of the other Defendant that gave rise to the breaches of fiduciary duty alleged in this Complaint, each Defendant enabled the breaches of the other Defendant through its own fiduciary breaches, and each Defendant failed to remedy the breaches of the other Defendant. Each Defendant is therefore liable as a co-fiduciary for the breaches of fiduciary duty committed by the other Defendant.

88.      As a consequence of each Defendant's wrongful acts and failures to act, the Plan has suffered millions of dollars in losses due to excessive, unreasonable, and inappropriate fees. Defendants are liable to make good to the Plan all such losses, and to disgorge all profits resulting from Defendants' unlawful conduct, in addition to further equitable and injunctive relief.

28

## PRAYER FOR RELIEF

89.     Wherefore, Plaintiffs, as representatives of the Class and on behalf of the Plan, pray for relief as follows:

a.  A determination that this action may proceed as a class action under Federal Rule of Civil Procedure 23;

b.  Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

c.  A declaration that Defendants have breached their fiduciary duties under ERISA;

d.  A declaration that Defendants violated 29 U.S.C. § 1106 by engaging in prohibited transactions;

e.  An order compelling Defendants to make good all losses incurred as a result of the breaches of fiduciary duties and prohibited transactions described above;

f.  An accounting of profits earned by NRECA in connection with the breaches of fiduciary duties and prohibited transactions described above, and a subsequent order requiring NRECA to disgorge all such profits received;

g.  An order enjoining Defendants from any further violations of ERISA;

h.  Other equitable relief to redress the practices described herein and to enforce the provisions of ERISA;

i.  An award of pre-judgment interest;

j.  An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine; and

k.  Such other and further relief as the Court deems just and equitable.


Dated: July 25, 2019                         /s/ Gregg C. Greenberg
                                             Gregg C. Greenberg, VA Bar No. 79610
                                             ggreenberg@zagfirm.com
                                             **ZIPIN, AMSTER, & GREENBERG**.
                                             8757 Georgia Ave., Ste. 400
                                             Silver Spring, MD 20910
                                             Telephone: (301) 587-9373
                                             Facsimile: (240) 839-9142

*- and -*

**NICHOLS KASTER, PLLP**

Kai H. Richter, MN Bar No. 0296545*
Paul J. Lukas, MN Bar No. 22084X*
Carl F. Engstrom, MN Bar No. 0396298*
Brandon T. McConough, MN Bar No. 0393259*
Chloe A. O'Neill, MN Bar No. 0398257*
     *pro hac vice applications forthcoming*
4600 IDS Center
80 S 8th Street
Minneapolis, MN 55402
Telephone: 612-256-3200
Facsimile: 612-338-4878
krichter@nka.com
lukas@nka.com
bmcdonough@nka.com
cengstrom@nka.com
coneill@nka.com

***ATTORNEYS FOR PLAINTIFFS***